In The United States District Court
For The Southern District of Illinois

Orlando Harvey
          Plaintiff

           vs.                              No. 21-803-SMY

Percy Myers
Jeffery Dennison
Rob Jeffreys
Wexford Health Sources Inc.,
          Defendants

I
Jurisdiction and Venue

This is a civil action authorized by 42 U.S.C. §
1983 to redress deprivations under color of State
law of rights secured by the Eighth and Fourteenth
Amendments of the Constitution of the United
States. This court has jurisdiction under 28
U.S.C. § 1331 and 1343(a)(B). Plaintiff seeks
declaratory relief pursuant to 28 U.S.C. § 2201 and
2202. Plaintiff also seeks injunctive relief

1

authorized by 28 U.S.C. § 2283, 2284 and Rule 65 of the Federal Rules of Civil Procedure.

2. The Southern District of Illinois is an appropriate venue under 28 U.S.C. § 1391 (b)(2) because Pinckneyville Correctional Center in Perry County, Illinois, is where the events given rise to this complaint occurred.

## IV

## Plaintiff

3. Plaintiff Orlando Harvey is, at all times mentioned herein, in the custody of the Illinois Department of Corrections. He is currently confined at Pinckneyville Correctional Center, in Pinckneyville, Illinois.

## III

## Defendants

4. Defendant Percy Myers is, at all times mentioned herein, a doctor and Medical Director at Pinckneyville Correctional Center. He is legally

2

responsible for the health, well-being and every medical decision regarding each inmate held at said facility. He is being sued in his individual and official capacity.

5. Defendant Jeffrey Dennison is, at all times mentioned herein, the warden at Pinckneyville Correctional Center. He is legally responsible for the day-to-day operations at said facility, including but not limited to, the health and well-being of every inmate housed there. He is being sued in his individual and official capacity.

6. Defendant Rob Jeffreys is, at all times mentioned herein, the Director of the Illinois Department of Corrections. He is legally responsible for the health and well-being of each and every inmate held at every facility within the Illinois Department of Corrections, including Pinckneyville Correctional Center. He is being sued in his individual and official capacity.

7. Defendant Wexford Health Sources Inc., is, at

3

all times mentioned herein, the company contracted by the Illinois Department of Corrections to provide medical and mental health treatment to the inmate population at each and everyone of its facilities. It is being sued in its official capacity.

## IV
## Facts

8. On June 9, 2020, Plaintiff was forced to jump down from the top bunk, because there is no ladder, when his right knee popped out of place and migrated to the left side of his leg.

9. At or about 4:00 pm on June 9, 2020, after complaining for hours about the excruciating pain he was in, Plaintiff was finally taken to the Health Care Unit (HCU).

10. While in the (HCU), Plaintiff was given crutches, an ACE wrap, a permit for ice and moved to a new cell to get a lower bunk.

4

11. Between June 9, 2020 and June 12, 2020, Plaintiff's knee popped out of place five (5) different times.

12. On or about June 12, 2020, Plaintiff had an appointment with Defendant Dr. Percy Myers in the (HCU) for the first time regarding his knee injury.

13. During said appointment Defendant Myers prescribed Plaintiff ~~Tylenol~~ Tylenol and ordered an X-ray for his knee.

14. On or about June 16, 2020, Plaintiff's knee was X-rayed.

15. On or about June 23, 2020, Plaintiff saw Defendant Myers again in the HCU due to the extreme pain and swelling Plaintiff continued to experience in his knee.

16. Due to the pain and swelling Defendant Myers sent Plaintiff out to Pinckneyville Community Hospital.

5

17. While at Pinckneyville Community Hospital, the attending physician, Dr. George Grant performed an ultra sound on Plaintiff's right knee/leg.

18. Upon completion of the ultra sound, Dr. Grant informed Plaintiff that there was not a blood clot in his leg causing the swelling.

19. Dr. Grant also informed Plaintiff that he had spoken with Defendant Myers and advised him that Plaintiff needed an MRI to determine what his injury was. (See Physician Chart dated June 23 2020, attached hereto as exhibit B)

20. Plaintiff was returned to Pinckneyville Correctional Center where he spoke with Defendant Myers and relayed Dr. Grants recommendation that an MRI was needed to identify Plaintiff's injury.

21. Defendant Myers denied that Dr. Grant had made any such recommendation that Plaintiff needed an MRI.

6

22. On or about June 26, 2020, while in the foyer to get his pain medication, Plaintiff's crutches hit a puddle of water causing him to slip, fall and his knee to again pop out of place.

23. In July of 2020, Defendant Myers put in a medical referral for Plaintiff to receive an MRI with Defendant Wexford Health Sources, Inc.'s, Utility Management. (See exhibit B)

24. Defendant Wexford Health Sources Inc., denied the MRI referral and suggested six (6) week of physical therapy for Plaintiff. (See exhibit B)

25. In October of 2020, Plaintiff was provided with the MRI Dr. Strant recommended back on June 23, 2020.

26. The MRI indicated that Plaintiff had a torn right anterior cruciate ligament, right knee medial meniscal tear and a right knee lateral meniscal tear.

27. On January 25, 2021, Plaintiff had the operation

7

to repair his right knee. (See operative report dated January 25, 2021, attached hereto as exhibit E)

## V
## Exhaustion of Administrative Remedies

28. Plaintiff used the prison grievance system at Pinckneyville Correctional Center regarding all the issues in this complaint. (See grievance attached hereto as exhibit F)

29. When Plaintiff exhausted his administrative remedies at the institutional level he appealed the decision(s) to the Administrative Review Board (See exhibit F)

## VI
## Legal Claims

## Count I
## Deliberate Indifference

30. Plaintiff realleges and incorporates by reference

8

paragraphs 1-29

31. Failure to provide Plaintiff with timely and adequate medical care for a torn ACL, medial and lateral meniscal tears amount to deliberate indifference in violation of the cruel and unusual punishment doctrine of the Eighth Amendment.

32. Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted. United States Constitution Amendment VIII.

33. The Eighth Amendment's prohibition against cruel and unusual punishment embodies "broad and idealistic concepts of dignity, civilized standards of humanity and decency." It prohibits punishments which are, "incompatible with the evolving standards of decency that mark the progress of a maturing society." Estelle v. Hamble, 429 U.S. 97, 102 (1976).

34. An inmate must rely on prison authorities to

9

treat his medical needs; if the authorities fail to do so, those needs will not be met. Estelle, 429 U.S. at 103.

35. The Eighth Amendment safeguards a prisoner against a lack of medical care that may result in pain and suffering which no one suggest would serve any penological purpose. Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 828 (7th Cir 2009).

36. A delay in treating a non-life threatening but painful condition may constitute deliberate indifference, if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir 2010)

37. In addition, instructions from a specialist is evidence that a prison physician knew a particular course of treatment was recommended by at least one other medical professional at the time he or she chose not to provide that treatment Zaya v. Sood, 836 F.3d 800, 806 (7th Cir 2016).

10

38. Without any medical evidence whatsoever as to what Plaintiff's knee injury was, and with total disregard towards Dr. Hrard's recommendation that Plaintiff receive an MRI, a standard and accepted professional medical standard, Defendant Myers, in conjunction with Dr. Marcia, initiated an "alternative treatment plan" of six (6) weeks of physical therapy. (See exhibit B)

39. The accepted professional standard of medical care for a torn ACL and meniscus is surgery followed by physical therapy, not the other way around.

40. Defendants Wexford Health Sources Inc, and Myers decision to by pass accepted professional standards not only delayed Plaintiff from receiving a diagnosis and course of treatment for his knee injury but, said decision forced Plaintiff to endure the most excruciatingly painful (6) six weeks of physical therapy / torture he has ever endured, and delayed the surgery necessary to repair his ACL and meniscus for several months

11

41. The 7th Circuit has held that when a physician's treatment decision is so far afield of accepted professional standards that it was not actually based on a medical judgment a jury can infer deliberate indifference in violation of the Eighth Amendments prohibition against cruel and unusual punishment. Duckworth v Ahmad, 532. F.3d 675, 679 (7th Cir 2008)

42. Defendants Wexford Health Sources and Myers actions have fulfilled the deliberate indifference requirement outlined in Duckworth as it pertains to Plaintiffs knee injury.

43. Furthermore, it is Plaintiff's belief that the deprivations that occurred are a result of Defendant Wexford Health Sources, Inc., policy of hiring under and unqualified medical staff and cost cutting measures to increase profits.

44. For example, the minimum qualifications one needs to become a physician or medical director at any facility within the Illinois

12

Department of Corrections, via Defendant
Wexford Health Sources Inc., is CPR certification,
a current DEA number and a license by the State
of Illinois to practice medicine in all its branches.
(See Staff positions requirements attached hereto
as exhibit R)

45. In essence a veterinarian can be a
physician or medical director within the
Illinois Department of Corrections, via
Defendant Wexford Health Sources Inc.,
treating humans.

46. Moreover Dr. Roderick Matticks, Defendant
Wexford Health Sources Inc., employee, has
previously testified under oath that facility
medical directors were free, "to use their
independent medical judgment in assessing
and making recommendations for inmate
medical care," and "allegations that Wexford
denied ... specialty care based upon cost
cutting measures makes no sense," because
"special outside care of consultations and
surgery fees are paid directly by Medicaid

13

Illinois HFS to the provider (See statement attached hereto as exhibit S)

47 Dr. Matticks declaration is disingenuous and misleading.

48. Defendant Wexford Health Sources Inc, performance target indicates that 100% compliance is expected by its physicians and medical directors with regards to their quarterly hospital utilization ~~threshold~~ threshold. (See Performance targets attached hereto as exhibit W) ("Vendor shall keep off-site hospitalization to a minimum) as measured by the Annual Hospital Utilization Threshold. (Section 3.1.2).

49. Simply stated, physicians and medical directors have a set monetary amount to dedicate towards inmates going to see outside specialist and for surgeries, and are forbidden to exceed that amount because any dollar amount over said threshold is subtracted from the quarterly payment

14

paid to Defendant Wexford Health Sources by the
State

50. Lastly Defendants Jeffrey Dennison and
Rob Jeffreys have been added for the sole
purpose to ensure that if injunctive relief
is granted it shall be enforced

51. Due to Defendants acts and omissions
Plaintiff has sustained physical injuries and
mental anguish.

52. Plaintiff has no plain, adequate, or complete
remedy at law to redress the wrongs described
herein.

53 Plaintiff has and will continue to be
irreparably injured by the conduct of the
Defendants unless this court grants the
relief requested by Plaintiff.

## VII
## Prayer For Relief

15

Wherefore, Plaintiff respectfully prays this Honorable Court enter judgment.

54. Grant Plaintiff a declaration that the acts and omissions described herein violated his rights under the Constitution and laws of the United States; and

55. A preliminary and permanent injunction ordering Defendants to install some sort of device to allow individuals to safely climb in and out of top bunks;

56. Compensatory damages in the amount of one million dollars ($1,000,000.00) against the Defendants jointly and severely;

57. Punitive damages in the amount of fifty thousand dollars ($50,000.00) against the Defendants jointly and severely;

58. Damages for the intentional infliction of physical pain and mental anguish in the amount of one hundred thousand dollars

16

($100,000.⁰⁰) against the Defendants jointly and severely;

54. Plaintiff seeks a jury trial on all triable issues;

55. Plaintiff also seeks recovery of cost in this suit; and

56. Any additional relief this court deems just, proper and equitable.

Respectfully submitted.

X Orlando Harvey

Orlando Harvey B28569

Pinckneyville Correctional Center

5835 State Route 154

Pinckneyville, Il 62274

Dated: 6/30/21

Verification

I hereby verify that I have read the foregoing complaint and the matters alleged therein are true, except as to matters alleged on information and belief and as to those I believe them to be true. Orlando Harvey

Orlando Harvey

17

B

**FINAL**
Pinckneyville Community Hospital - Emergency Department
5383 State Route 154 P.O. Box 347, Pinckneyville, IL 62274
(618) 357-2187

Patient: HARVEY, ORLANDO
DOB:     07/27/1971  48 year/M  Wt: 215 lb(98 kg) S   Ht: 66 in(168 cm)
MRN:     055702                         PROVIDER: George R Grant, MD
Acct #:  744674                                  Printed: 06/24/2020 06:00
DOS:     06/23/2020 11:00                Physician Record - Page 1 of 5

## PHYSICIAN CHART

**CHIEF COMPLAINT:**
Knee/lower leg problem

**VITALS HISTORY:**
Weight:215 lb(98 kg) S Height:66 in(168 cm) BMI:34.55
06/23/2020 13:18. DISPOSITION: BP: 150/80 Arm Sitting (Automatic) MAP: 103.33
  mmHG, Temp: 98.5 °F Oral, HR: 68 Sitting Awake (Automatic) , RR: 16, O2 Sat: 98%
06/23/2020 11:00. TRIAGE: BP: 133/78 Arm Sitting (Automatic) MAP: 96.33 mmHG,
  Temp: 98.8 °F Oral, HR: 69 Sitting Awake (Automatic) , RR: 20, Pain: 9/10 ( Number
  scale )

**CURRENT MEDICATIONS:**
HYDROCHLOROTHIAZIDE 25 MG Dose: 1 tablet(s) Route: Orally Frequency: Daily
  Last Taken: Unknown
KCL 10 MEQ Dose: 1 tablet(s) Route: Orally Frequency: Daily Last Taken: Unknown
NATURAL TEARS Dose: 1 drop(s) Route: Ocular, Bilateral Frequency: Daily, As needed
  Last Taken: Unknown
TYLENOL 500 MG Dose: 1 tablet(s) Route: Orally Frequency: As needed Reason: PAIN
  Last Taken: Unknown
ZESTRIL 100 MG Dose: 1 tablet(s) Route: Orally Frequency: Daily Last Taken: Unknown
PRISON PHARMACY -[NCK@06/23/2020 11:26]
Medication source: Patient / Family
Medication Reconciliation Completed and Signed by Nancy C Keller, RN on 06/23/2020
  11:26

**ALLERGIES:**
Patient or patient family denies any allergies

**MODE OF ARRIVAL:**
The patient arrived in a wheelchair. The patient was transferred from (PINCKNEYVILLE
  CORRECTIONAL CENTER. ).

**PREHOSPITAL (PHYS):**
No prehospital care was provided.
  **Additional Information:**   THEY GAVE PATIENT LOVENOX 60 MG SQ BEFORE
  BRINGING HIM IN TO ER. -[NCK@06/23/2020 11:29].

**HISTORY OF PRESENT ILLNESS:**
This patient is a 48 year old male who presents with a chief complaint of knee/lower leg
  problem. Provider assessment time was 06/23/2020 11:10. I reviewed the vital signs, the
  oxygen saturation result and the nursing/ treatment notes and I agree with what is
  documented. I agree with the chief complaint selected for this patient's chart. The onset
  was 1 week(s) prior to arrival. The symptoms are (in the) right knee and lower leg. The

severity of the pain was moderate. There is no ability to bear weight. The injury was as the result of a fall. It is unclear what is causing the patients symptoms. There is no history of gout, arthritis or a knee operation. There is no history of having had a similar problem in the past. The patient's last tetanus immunization was within the previous 5 years and the patient's last tetanus immunization was between 5 and 10 years ago. There was associated swelling, knee pain and leg pain. There was no associated abrasion, fever, laceration, numbness, redness or weakness. Other History / Staff Note: The patient states that about a week ago he jumped down onto the floor out of the top bunk. His foot went lateral well his knee went medial causing a strain. He states that since that time he has had swelling and pain in his knee and leg. He denies any chest pain, cough, hemoptysis, shortness of breath. -[GG@06/23/2020 11:18].

## ROS
CONSTITUTIONAL:    Negative for fever.
EYES:    Denies any eye problems.
ENT:    Denies any ear problems. Denies any nose problems. Denies any throat problems. Denies any mouth problems.
RESPIRATORY:    Denies any respiratory problems.
CV:    Denies any cardiovascular problems.
GI:    Denies any GI problems.
GU:    Denies any GU problems.
NEUROLOGICAL:    Negative for numbness and weakness.
MUSCULOSKELETAL:    Positive for right leg pain and knee pain.
INTEGUMENTARY:    Negative for redness, wounds and lacerations.

## PAST MEDICAL HISTORY (PHYS):
**Immunizations:**    Immunization history is unknown. The patient's last tetanus immunization was within the previous 5 years.
**Medical:**    Known carrier of PLANTAR FASCITIS LEFT FOOT. -[NCK@06/23/2020 11:32]. CARDIOVASCULAR: History of hypertension. GI: History of gastroesophageal reflux disease. MUSCULOSKELETAL: No history of osteoarthritis.
**Surgical:**    The patient has no history of knee surgery.

## FAMILY HISTORY (PHYS):
Maternal history is positive for diabetes. Paternal History is unknown. Sibling History is unknown.

## SOCIAL HISTORY (PHYS):
**Habits:**    Tobacco use: Former smoker. No reported alcohol use. No reported illegal drug use.
**Lives:**    The patient lives a locked facility. Other: PINCKNEYVILLE CORRECTIONAL CENTER. -[NCK@06/23/2020 11:33].

## INITIAL VITALS AT PRESENTATION:
Weight:215 lb(98 kg) S Height:66 in(168 cm) BMI:34.55
06/23/2020 11:00. TRIAGE: BP: 133/78 Arm Sitting (Automatic) MAP: 96.33 mmHG. Temp: 98.8 °F Oral, HR: 69 Sitting Awake (Automatic) , RR: 20, Pain: 9/10 ( Number scale )

## PHYSICAL EXAMINATION
**Constitutional:**    The patient was alert and well-appearing. The patient was not exhibiting an odor of alcohol (ETOH) and not ill-appearing. The patient was in no distress.

**Respiratory:** The pulse oximeter reading was within a normal range. The lung sounds were clear, and breath sounds were equal bilaterally. Right lung negative for wheezes, rales and rhonchi. Right breath sounds were not diminished. Left lung negative for wheezes, rales and rhonchi. Left breath sounds were not diminished.

**CV:** Heart rate was normal and the rhythm was regular. There was no S3 gallop present and no S4 gallop. There was no systolic murmur or diastolic murmur.

**Musculoskeletal:** KNEE: Positive for right swelling. There was moderate knee tenderness. LEG: Positive for right swelling. There was no distal sensory deficit or distal motor deficit. Additional findings: The patient has some bruising noted at the medial ankle. This is just inferior to the medial malleolus. He denies any injury and this may represent a dissection from a more proximal location. -[GG@06/23/2020 11:20].

**Skin:** Negative for abrasion(s), contusion(s), laceration(s), blister(s) and an open fracture.

## DIAGNOSTIC CONSIDERATIONS FOR KNEE/LOWER LEG PROBLEM:

DIAGNOSTIC CONSIDERATIONS: Meniscus injury, Sprain: MCL LCL ACL PCL and DVT -[GG@06/23/2020 11:21].

(I have considered the above as the potential cause of the patient's condition. I have based my consideration on a limited patient encounter, and my considerations may not be all-inclusive. History, physical examination, and/or diagnostic studies, in combination with medical judgment, have been used in determining the final diagnosis)

## NOTES/COURSE:

**CONSULTATION(S):**
MYERS, PERCY , MD,Call returned: 06/23/2020 12:55
Action: Telephone Consult Only
relayed the results of the ultrasound to the physician. Advised the physician on a need for an MRI of the knee due to the joint effusion and the examination.

## ORDERS AND RESULTS:

**US VENOUS DOPPLER UNILATERAL - IV NO O2 NO**        Indications: DVT; Placed at 06/23/2020 11:11, GG, MD; Completed at 12:25, NCK, RN; Reviewed at 12:50, GG, MD; G. Grant at 06/23/2020 12:50 Acknowledged and Reviewed. ; Interpreted by radiologist.

Pinckneyville Community Hospital
Pinckneyville, IL 62274
RADIOLOGY DEPARTMENT REPORT

Patient Name: HARVEY, ORLANDO Account No: 744674
Patient Phone: (618) 357-9722 Sex: M
Age: 48 Admit Phys: GRANT, GEORGE
Birth date: 7/27/1971 Med Rec Num: 055702
X-ray number: 182723420200623 Stay Type: E
Exam Date: 6/23/2020 Ordering Phys: GEORGE GRANT
Primary Phys:

*** Unsigned transcriptions represent a preliminary report and do not reflect corrections, additions, and/or subtractions to the information contained in this report. ***

EXAM DESCRIPTION: US VENOUS DOPPLER UNILAT

REASON FOR STUDY: RLE PAIN SWELLING
S/P TWISTING INJURY TO KNEE

Duration: 6/9/20

TECHNIQUE: Duplex scan using the B-mode, spectral Doppler, and color-flow Doppler of the deep venous system of the right lower extremity was performed. Images stored on PACS.

COMPARISON: None.

FINDINGS: The common femoral, common femoral-saphenous vein confluence, visualized profunda femoral, superficial femoral, and popliteal veins are readily compressible with no intraluminal thrombus on gray scale images. There is normal color and spectral Doppler signal, including augmentation. Greater saphenous vein appears patent. Visualized calf veins are patent. There is some edema within the soft tissues of the calf. In the right lateral knee at the area of pain there is a complex area of heterogeneous fluid measuring at least 5 x 3.9 x 4 cm. On some of the images this appears possibly due to a joint effusion, areas predominantly anechoic with internal echogenicity and complexity. Technologist raises the possibility of a hematoma which is not excluded.

IMPRESSION:
1. No evidence of right lower extremity deep venous thrombosis.
2. Mildly complex 5 cm fluid collection right lateral knee area of interest appears to be due to a joint effusion. Technologist also raises the possibility of a hematoma, which is not excluded.
3. Could consider radiographic correlation. If there is a high clinical concern for internal derangement, follow-up routine MR might be considered.

*** THIS IS AN ELECTRONICALLY VERIFIED FINAL REPORT ***
6/23/2020 12:41 PM - Electronically signed by Chester Harrison M. D.

PAGE 1 of 2
Pinckneyville Community Hospital
Pinckneyville, IL 62274
RADIOLOGY DEPARTMENT REPORT

Patient Name: HARVEY, ORLANDO Account No. 744674
Patient Phone: (618) 357-9722 Sex: M
Age: 48 Admit Phys: GRANT, GEORGE
Birth date: 7/27/1971 Med Rec Num: 055702
X-ray number: 182723420200623 Stay Type: E
Exam Date: 6/23/2020 Ordering Phys: GEORGE GRANT
Primary Phys:

*** Unsigned transcriptions represent a preliminary report and do not reflect corrections, additions, and/or subtractions to the information contained in this report. ***

Chester Harrison M. D.

CH: CH
D: 6/23/2020 12:41 PM
T: 6/23/2020 12:41 PM

Report ID: 1624717
Reading Location: CRPACSDX207

<<REPDIST>>

PAGE 2 of 2

## PROCEDURES:

**TREATMENT TIMES:**
EVALUATION AND TREATMENT: The time spent for the patient evaluation and
treatment was: 1100: 1110 - 1251 George R Grant, MD.

**IMPRESSION**
**JOINT EFFUSION - RIGHT KNEE**
**UNSPECIFIED INTERNAL DERANGEMENT OF RIGHT KNEE**

**DISPOSITION (PHYS):**
The disposition time decision was 06/23/2020 12:51.
Discharge.
**Discharge:**     The patient was discharged to Pinckneyville Correctional Center. The
patient's condition upon discharge was good and stable. Education was provided to the
patient in reference to the final impressions, treatment, prognosis and need for follow up.
**Instructions given to the patient:**      Knee Effusion, Knee Pain.
**Follow up provider:**     MYERS, PERCY , MD, P. O. BOX 1000 PINCKNEYVILLE IL
62274, (618) 357-9722.
**Follow up:**     NONE.

**SIGN OFF:**
G. Grant, MD
Chart electronically signed by George R Grant, MD on 06/23/2020 12:56

**Patient Signature:**

 **Wexford Health**
SOURCES INCORPORATED

ALTERNATE TREATMENT PLAN

To:         Site Medical Director and HSA
From:       Utilization Management
Date/Time:  07/06/2020 / 15:55:30

Inmate Name / HSN:  ORLANDO HARVEY / B28569
Date of Birth:  07/27/1971
Site:  PINCKNEYVILLE
Service:  73721-MRI JNT OF LWR EXTRE W/O DYE

Based upon a review of the information provided, it is my medical opinion that:
1. The above requested service is not authorized at this time based on the following:

Comments:   7-2-20 Received request for MRI knee for a patient who injured his knee on 6/9/20 and
            again 6/23/20. Patient slipped on the wet floor. Knee with increased swelling and severe
            pain. Reviewed by Dr. Garcia and ATP'd request for PT Eval for HEP, perform HEP
            directly observed, and re-present if needed after PT has been completed.

From:_____
            Dedicated Utilization Management Physician

--------------------------------------------------------------------------------

2. ___ ATP Revisited (Date)
      a. ATP Information

      _____
      Signature of Appellant

      b. Appealed Decision:   /   /

From:_____
            Dedicated Utilization Management Physician

3. I want a second opinion of the Alternate Treatment Plan.
   Signature:_____ Date/Time:_____.
4. I will re-consult upon completion of alternate medical plan, if indicated.
   Signature:_____ Date/Time:_____.

INFORMATION CONTAINED IN THIS DOCUMENT IS PRIVILEGED AND CONFIDENTIAL

Wexford Health Sources
Phone: 877-939-2884 -or- 800-353-8384
Fax: 412-937-9151
www.wexfordhealth.com

ILLINOIS DEPARTMENT OF CORRECTIONS
## Medical Special Service Referral Denial or Revision

Offender's Name: _Harvey, Orlando_     ID# _R 28564_

Referral Date: _7/2/20_

Initial Proposed Course of Action: _Im Injured his knee +_
_then re injured the knee. Also leg swelling c̄ Pain._
_U.S. -WNL [R/O DVT]_

Alternative Care Recommended: _P.T. Evaluation + then F/u_
_p̄ the evaluation._

The offender has the right to appeal any adverse decisions through the grievance procedure outlined in 20 Ill. Adm. Code 504: Subpart F.

_Percy Myh_                         _7/7/20_
Print Facility Medical Director's Name     Facility Medical Director's Signature     Date

Distribution:  Offender, Offender's Medical File, and
Heath Care Unit Administrator                (Printed on Recycled Paper)               DOC 0255 (Eff.4/2007)

# EXHIBIT
# E

FROM                                         (MON)MAR  1 2021 14:27/ST. 14:27/No. 7519748143 P  2

( 1 )

---

## Operative Report

| | | | |
|---|---|---|---|
| **Patient Name:** | Orlando Harvey | **Date of Service:** | January 25, 2021 |
| **Patient ID:** | 41001 | **Date of Birth:** | July 27, 1971 |
| **Clinician:** | Robert Golz, M.D. | | |

---

### SOUTHERN ILLINOIS ORTHOPEDIC CENTER

### OPERATIVE REPORT

**PREOPERATIVE DIAGNOSES:**
1. Torn right anterior cruciate ligament.
2. Right knee medial meniscal tear.
3. Right knee lateral meniscal tear.

**POSTOPERATIVE DIAGNOSES:**
1. Torn right anterior cruciate ligament.
2. Right knee medial meniscal tear.
3. Right knee lateral meniscal tear.

**OPERATIVE PROCEDURES:**
1. Right knee arthroscopy and debridement.
2. Right knee partial medial meniscectomy.
3. Right knee partial lateral meniscectomy.
4. Right knee ACL reconstruction utilizing a mid-1/3 patellar tendon graft.

**SURGEON:** Dr. Golz

**ASSISTANT:** Rob Deaton, FNP

My nurse practitioner, Rob Deaton, FNP, was utilized and required throughout the procedure for positioning, soft tissue approach, retraction, assisting, wound closure, and dressing application. I felt his participation as a surgical assistant was medically necessary and appropriate.

Additionally, Mr. Deaton participated in both the preoperative evaluation and planning for the patient as well as in the postoperative management and care.

**ANESTHESIA:** General endotracheal.

**TOURNIQUET:** 18 minutes.

**COMPLICATIONS:** None

**EBL:** 25 cc

**INDICATIONS:** The patient is a 49-year-old black male, a resident of the Pinckneyville Correctional Center. He is heavyset (BMI=35.8) with a history of hypertension. The patient had no prior complaints to his right knee until an acute injury in June when he misstepped and fell. Over the interval, he has had continued functionally limiting complaints that have been, unresponsive to conservative treatment and characterized by instability. Evaluation, including MRI, showed only very early degenerative changes, good overall alignment, but he had a torn ACL and medial and lateral meniscal tears and a suspicion for a loose body. Options of management were discussed with

---

| | |
|---|---|
| **PATIENT:** Orlando Harvey | **SURGEON:** Robert Golz, M.D. |
| **SS#:** 41001 | **SURGERY DATE:** 1/25/2021 |
| **DOB:** 7/27/1971 | |

---

Name: Harvey, Orlando                    DOB: 07/27/1971                                      Date:

him. The potential risks and complications of surgery were outlined, especially concerns for degenerative changes, deep venous thrombosis, wound infection, the importance of compliance with therapy in the postoperative period, and concerns for the current COVID-19 pandemic. He understood all of the above. Informed consent was obtained and he is being brought to the OR at this time for ACL reconstruction.

TECHNIQUE: The patient was brought into the operating room, secured to the operating table in the supine position where adequate anesthesia was obtained and prophylactic antibiotics were administered.

Examination of the contralateral left knee showed 5 to 10 degrees of recurvatum. He had a 1 to 2+ anterior drawer and Lachman but a firm endpoint. Examination on the right side showed good alignment to the limb. He had full hip motion, full knee motion, and again approximately 5 degrees of recurvatum. He was grossly unstable with a 3+ anterior drawer, a 3+ Lachman, and a positive pivot shift. He had no varus/valgus laxity. I could not elicit any meniscal signs. He had a moderate effusion and mild patellofemoral crepitus.

The leg was secured in the arthroscopic leg holder. Foot of the table was flexed allowing the leg to hang free. The contralateral leg was padded and supported. The affected extremity was then prepped and draped in a sterile fashion. Landmarks about the knee were outlined and intended portals were infiltrated with 1% Xylocaine with epinephrine.

Standard arthroscopic portals were created using #15 blade for stab incision in the skin, and blunt trocar for entry into the joint. A superior medial inflow portal was established.

The irrigation solution was instilled using the inflow pump and the knee distended appropriately. A 30-degree arthroscope was inserted though the anterolateral portal and then meniscal probe through the anterior medial portal to facilitate examination.

Arthroscopic examination of the knee revealed a hemarthrosis present. This was evacuated. He had a moderate degree of diffuse nonspecific hypertrophic synovitis and bled quite easily with initial debridement and exposure. Epinephrine was added to the solution. Tranexamic acid was given intravenously. An ArthroCare unit was utilized and with this adequate hemostasis was obtained. He had primarily grade 2 chondromalacia in a tricompartmental fashion. The patella itself tracked well. He had a tear of the anterior cruciate ligament with a lateral empty wall. He had a very prominent cyclops lesion, which was thought to represent the loose body on MRI. He had a complex multiplanar tear in the posterior 1/2 of the medial meniscus and had a similar complex tear in the posterior horn of the lateral meniscus, which had actually torn anterior to the popliteal hiatus and extended back to the root. The tear was not amenable to repair.

Operative arthroscopy was then undertaken. All loose frayed articular cartilage was gently debrided. The stump of his ACL was debrided. A partial medial meniscectomy was carried out, which required an accessory posteromedial portal, and this took the medial meniscus back to the capsular margin in the posterior 1/2 and then gently beveled the meniscectomy anteriorly. Similarly, laterally, a partial lateral meniscectomy was carried out again completing the tear in the posterior 1/2 back to the capsular margin extending to its root attachment and then beveling the meniscectomy anteriorly. He had a very stenotic notch and an aggressive notchplasty was performed.

Attention was then directed to graft harvest. The leg was elevated, exsanguinated, and tourniquet inflated at 300 mm. of Mercury pressure. A 10 cm longitudinal incision was made from the mid portion of the patella to the tibial tubercle and carried sharply through the skin and subcutaneous tissue. The arciform layer was divided and elevated. The patellar tendon was sized. A mid one-third bone tendon bone graft was harvested utilizing the oscillating saw, osteotomes, and double blade knife. Care was taken to preserve the articular surface of the patella and maintaining an intact superior cortical bridge. The graft was then taken to the back table, prepared and placed in a bed of moist saline.

Utilizing the power shaver the stump of the torn ACL was debrided. Utilizing a burr a thorough notchplasty was performed widening the lateral and superior portions of the notch taking care to preserve the PCL. Posterior

PATIENT: Orlando Harvey                     SURGEON: Robert Golz, M.D.
SS#: 41001                                   SURGERY DATE: 1/25/2021
DOB: 7/27/1971

FROM                                      (MON) MAR  1 2021 14:28/ST. 14:27/No. 7519748143 P  5

( 2 )



Patient:            Orlando Harvey
Date of Birth:      07/27/1971 Age: 49
Date:               02/12/2021 9:30 AM
Visit Type:         Post Op Visit


## CHIEF COMPLAINT:

No electronic records were available at the time of dictation.

S/P right ACL reconstruction with mid 1/3 patellar tendon graft, partial medial and lateral meniscectomy with early-to-moderate degenerative arthritis, right knee, 01/25/2021.

## HISTORY OF PRESENT ILLNESS:

1. knee

The patient is in for followup.  He is now 2-1/2 weeks following his right ACL reconstruction. He has some concerns about his care at the prison.  He has apparently been moved out of the health care unit.  He has not getting therapy. He states his knee is doing well.  He had some similar concerns about his brace.


## PAST MEDICAL HISTORY  (Detailed)

GERD
Glaucoma
Hypertension


## PAST SURGICAL HISTORY

Rt ACL Recon, Rt Knee               2021
Scope


## SOCIAL HISTORY  (Detailed)

Tobacco use reviewed.
Preferred language is English.
Tobacco use status: Current non-smoker.
Smoking status: Never smoker.
ALCOHOL
There is no history of alcohol use.


Harvey, Orlando    000000258245 07/27/1971 02/12/2021 09:30 AM Page: 1/3

aspect of the notch was well visualized.

The tibial guide was positioned on the anterior medial cortex adjacent to the tubercle. A guide tip was positioned on the articular surface at the prior insertion site of the ACL. A smooth K-wire was drilled through the guide with proper placement being confirmed arthroscopically. A pre-sized cannulated reamer was used to create the tibial tunnel maintaining a good proximal bridge. The tunnel's articular opening was chamfered and rasped smooth.

The offset femoral notch guide was placed through the tibial tunnel and secured on the posterior cortex of the femur recreating the proper orientation for the reconstructed ligament. With the knee maintained in a flexed position, a large Bayonet pin was drilled through the femoral guide and passed onto the anterior aspect of the femur where it was secured with a T-handled reamer. Using the pre-sized cannulated reamer, the femoral tunnel was created and its edges were rasped smooth. The tunnel was felt to be well posterior while maintaining an adequate posterior wall.

The prepared graft was readied and utilizing passing sutures was secured in the proper position with the cancellous surface of the bone plugs oriented anteriorly. Maintaining tension on the graft the knee was cycled several times. The graft was felt to be in good position with the bone plugs contained within the tunnels, good clearance throughout the notch, and isometric tension. A cannulated interference screw was utilized for fixation of the femoral plug and placed in a position of flexion, external rotation, with a slight posterior drawer applied. With the graft being maintained under appropriate tension, a tibial cannulated interference screw was placed with good purchase being obtained.

The knee was cycled several times. The graft was in good position with good clearance throughout a range of motion. The Lachman and drawer tests were reassessed and were essentially negated.

The joint was then thoroughly irrigated, suctioned free of all irrigation solution and debris and all arthroscopic instruments were removed. 20 cc. of Marcaine was instilled intra-articularly. Cancellous bone graft was used to fill the patellar and tibial defects. The tourniquet was deflated and adequate hemostasis was obtained. The wound was closed in three layers with the patellar defect reapproximated with 0 Vicryl, the sub-q layer with 2-0 Vicryl, and skin with surgical staples. A soft sterile compressive dressing was placed on the wound and the lower extremity was immobilized in a knee lock brace.

The patient was taken to the Recovery Room in stable condition. The procedure was tolerated well. There were no complications.

Robert Golz, M.D.

Date Dictated:      01/25/2021
Date Transcribed:   01/26/2021
RG/jk
Job #: 226996422

cc:   Pinckneyville Correctional Center Infirmary

PATIENT: Orlando Harvey          SURGEON: Robert Golz, M.D.
SS#: 41001                       SURGERY DATE: 1/25/2021
DOB: 7/27/1971

FROM                                    (MON)MAR  1 2021 14:28/ST. 14:27/No. 7519748143 P  8

( 3 )

## FAMILY HISTORY (Detailed)

Family history of Diabetes mellitus

## MEDICATIONS:

Patient Status
Completed with information received for patient transitioning into care.
Medication Reconciliation
Medications reconciled today.
Medication Reviewed

| Medication Name | | Where | Status |
|---|---|---|---|
| hydrochlorothiazide | Y | | Verified |
| potassium chloride | Y | | Verified |
| Zestril | Y | | Verified |
| latanoprost (PF) | | | Verified |

## ALLERGIES:

NO KNOWN ALLERGIES

## Vital Signs
## VITAL SIGNS

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| 5.0 | 6.00 | 167.64 | | 3:31 PM | Kendra Cross |

## Comments

3:31 PM    Unable to obtain Blood Pressure and Weight.

## PHYSICAL EXAM:

On exam, he is in the office with his correctional officers. He is ambulating well with his crutches. He is in a knee locked brace. Wounds are all well healed. Sutures removed and Steri-Stripped. He can do several straight leg raises, although he fatigues easily and fasciculates; trouble maintaining it versus much resistance. Motion is good, 0 to 110 degrees. No significant effusion. No DVT.

## DIAGNOSTICS:

| | | | |
|---|---|---|---|
| 02/12/2021 | Pain in right knee | Knee Xray 3 Views | Golz MD, Robert J |

Diagnostic Interpretation: Arthroscopic findings and most specifically the significant meniscal pathology that was

Harvey, Orlando    000000258245 07/27/1971 02/12/2021 09:30 AM Page: 2/3

FROM                                                    (MON)MAR  1 2021 14:29/ST. 14:27/No. 7519748143  P   7

present in the early degenerative changes.

He did have radiographs in the clinic today, which show his interference screws to be in proper position.

## CLINICAL ASSESSMENT/PLAN:

| | | |
|---|---|---|
| 1. | Assessment | Pain in right knee (M25.561). |
| 2. | Assessment | S/P ACL reconstruction (Z98.890). |

Plan:
I think he is progressing satisfactorily. I reviewed the importance of his self responsibility for home exercise program and reviewed these exercises with him, although I certainly think he would benefit from a formal structured therapy. I would continue the crutches for assisted ambulation. Continue his knee locked brace and protective mechanics. We will see him back in the clinic in 6 weeks for recheck. They will call over the interval with any change in his status.

Robert J. Golz, MD/60002

The patient was checked out at 3:34 PM.

Electronically signed by : *Robert J. Golz MD* 02/12/2021 09:30 AM

*Document generated by:* N. Admin 02/17/2021 10:08 AM        v 8.4/8/9
v.8.4/8.9

--------------------------------------------------------------

510 Lincoln Drive Herrin, IL 62948 - Phone: 618.997.6800 - Fax: 618.998.9635 - www.orthopaedicinstitute.com

Electronically signed by Robert J. Golz MD on 02/26/2021 05:05 PM

# EXHIBIT

# J

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender's Grievance**

| Date: 6/24/20 | Offender (please print): Orlando Harvey | ID #: B-28569 | Race (optional): |
|---|---|---|---|

| Present Facility: Pinckneyville Corr. Center | Facility where grievance issue occurred: Pinckneyville Corr. Center |
|---|---|

**Nature of grievance:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Disciplinary Report
- [ ] Mail Handling
- [ ] Dietary
- [ ] Other (specify)
- [X] Medical Treatment
- [ ] HIPAA
- [ ] ADA Disability Accommodation
- [ ] Restoration of Sentence Credit

Date of report "Copied"    Facility where issued

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Search Record, etc.) and place in the designated locked receptacle marked "grievance".

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to review by the Administrative Review Board
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor
Chief Administrative Officer, only if EMERGENCY grievance
Mail to Administrative Review Board, only if the issue involves protective custody, involuntary administration of psychotropic drugs, issues from another facility except medical and personal property issues, or issues not resolved by the Chief Administrative Officer.

**Summary of Grievance** (Provide information including a description of what happened, when and where it happened, and the name or identifying information for each person involved):

On 6/9/20 While trying to get from the top bunk to the floor, "Because there are no Ladders on the bunks, I am forced to Jump out of the bed on a daily basis". On this day "6/9/20 I Jumped out of my bed, my Knee popped out of place. My right Knee was on the left side of my right Leg. The pain is/was "excruciating. I was taken to health Care at about 4:7pm on June 9th. Where I was giving a 3" Ace rap, a bag of Ice, Crutches and Sent back to one house and moved ☒ Continued on reverse

**Relief Requested:**

#1- To have the "Footage from the camera in one house Core Preserved" from day June 23rd at 8:15-8:45 pm at night med-Line. #2- To have my right Leg/Knee "MRI"). To have proper medical Treatment. #3- To be compensated for my pain and Suffering. #4- To have Ladders put on all upper bounks, in I.D.O.C.

[X] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

[ ] Check if this is NOT an emergency grievance.

| Orlando Harvey | B 28569 | 6/24/2020 |
|---|---|---|
| Offender's Signature | ID# | Date |

(Continue on reverse side if necessary)

| Counselor's Response (if applicable) | Date Received: | [ ] Send directly to Grievance Officer |
|---|---|---|

[ ] Outside jurisdiction of this facility. Send to Administrative Review Board, PO Box 19277, Springfield, IL 62794-9277

Response:

| Print Counselor's Name | Sign Counselor's Name | Date |
|---|---|---|

Note to offender: If you disagree with the counselor's response, it is your responsibility to forward grievance with counselor's response to the grievance officer.

| MERGENCY REVIEW: | Date Received: 6/25/20 |
|---|---|

Is this determined to be of an emergency nature:

[X] Yes, expedite emergency grievance
[ ] No, an emergency is not substantiated. Offender should submit this grievance according to standard grievance procedure

| Chief Administrative Officer's Signature | 6/25/20 |
|---|---|
| | Date |

Assigned Grievance #/Institution                                                      Housing Unit                    bed #

1st Col  #6                          ILLINOIS DEPARTMENT OF CORRECTIONS                    2nd Col #6
                                          Offender's Grievance

to cell 25 with a LowBunk permit. While in Cell 25 my knee
Snipped out of place about 5-times. I put in a sick Call slip for the
pain and to see a doctor. On 6/12/20 I saw Doctor Myers. He put
me in for some Tylenol and said he'll put me in for X-Ray. 6/15/20
I received the Tylenol. 6/16/20 I got my Leg X-Rayed. By then my Leg
was so swollen, I put in 3-sick Call slips, only to be told I'm on the
doctor's call line. 6/23/20 I was seen by Doctor Myers. My leg
was swollen so bad doctor Myers though I had a blood clot so he
sent me to Pinckneyville Hospital to see if I had a blood Clot, nothing
else. ✱ The Outside Doctor said that I needed a brace on that knee
to keep it stable, and Should have a MRI Done. He said he would
have done a MRI But they didn't have one at that Hospital. He said
the MRI machine comes in on a truck, and it was not there. that
day. "I told Doctor Myers what the outside doctor told me
but he said," That's not what He to me." And then sent me
back to my cell again without supporting my knee, and without
putting me in for a MRI to determine what's wrong with
my knee. Later that day 6/23/20 at about 8:15-8:45 PM...
I was called out my cell to the core for Med-Call-Line. Once I
received my eye drops, I turned around to return to my cell
when my crutch slipped in some water that was on the floor in
the core in front of the nurse station. ✱ This can be seen
on the One House Core Camera) on June 23rd at about 8:15-8:45 PM.
I ask that the Footage from said Camera be "Preserved".
As I tried to stop from falling, I put my foot down to keep
from falling. By doing this my unsupported knee Snapped and I
hit the floor in front of the cell house Org. and the Nurse
that was passing out Med. With my right Leg twisted behind
me I lyed on the floor in excruciating pain . I asked the
cell house Org. to help me by pulling my leg back in place, he
said im not touching it, im not a doctor. The nurse said she's not
gonna do it, so she called Health care. I was put in a wheele
chair and taken to healthcare where the nurse in the health gave
me a bigger Ace rap and a bag for Ice, then sent me back to
my cell once again. I went to the hospital earlier for that same
Leg. I told Doctor Myers that my knee ████████████ 'o|H
keep popping out and I need something to support my knee. But
he did "NOTHing" to keep from further injury to my knee.
I'm afraid to walk on the crutches i keep thinking about my
knee popping out. I keep having thoughts of my knee popping
out. Right Now im in excruciating pain. The Tylenol don't do
any-thing for the pain, I Need a MRI to determine
what's wrong with my (knee/Right Leg).

ID32

ILLINOIS DEPARTMENT OF CORRECTIONS
**RESPONSE TO OFFENDER'S GRIEVANCE**

| Grievance Officer's Report | | |
|---|---|---|
| Date Received: 06/25/2020 | Date of Review: 08/10/2020 | Grievance # (optional): 1597-06-20 |
| Offender: Orlando Harvey | | ID#: B28569 |

Nature of Grievance:

Medical treatment

**Facts Reviewed:**

Grievant claims that on 6/9/20 while trying to get from the top bunk to the floor, because there are no ladders on the bunks, he is forced to jump out of the bed and jumped out of his bed and his knee popped out of place. Grievant claims his right knee was the left side of his right leg and the pain was excruciating. Grievant claims he was taken to HCU about 4pm where he was given an ace wrap, bag of ice and crutches and sent back to one house and moved to cell 25 with a low bunk permit. Grjevant claims that while in that cell his knee popped out of place about 5 times. Grievant claims that on 6/12/20 he saw Dr. Myers and he put him in for some Tylenol and said he would put him in for an x-ray. On 6/15/20 he received the Tylenol, on 6/16/20 he received the x-ray but by then his leg was so swollen. Grievant claims he put in NSC slips only to be told he would be on the doctors call line. ON 6/23/20 he was seen by Dr. Myers and his leg was swollen so bad that he thought he had a blood clot so he sent him to Pinckneyville hospital to see if he had a blood clot and nothing else. Grievant claims the outside hospital said he needed a brace on that knee to keep it stable and should have an MRI done. Grievant claims he told Dr. Myers what the outside doctor said and he said "that's not what he told him" and sent him back to his cell. Grievant claims that later that evening around 8:15-8:45 pm he was called out for med call line and slipped in some water going back to his cell in which he twisted his right leg behind him causing him to be wheelchaired back to HCU. Grievant claims he was given a bigger ace wrap and a bag of ice and sent back to this cell. Grievant claims he told Dr. Myers that his knee keeps popping out and needs something to support his knee.

continued...

**Recommendation:**

Based upon a total review of all available information, it is the recommendation of this Grievance Officer that the offender's grievance be denied.

C. Hale, CCII

_C. Hale, CCII_

Print Grievance Officer's Name                               Grievance Officer's Signature
(Attach a copy of Offender's Grievance, including counselor's response if applicable)

| Chief Administrative Officer's Response | | | |
|---|---|---|---|
| Date Received: 8/12/20 | ☑ I concur | ☐ I do not concur | ☐ Remand |

Action Taken:

Chief Administrative Officer's Signature                    6/12/12
                                                            Date

| Offender's Appeal To The Director | | |
|---|---|---|

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must, within 30 days after the date of the Chief Administrative Officer's decision, be received by the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response if applicable, and any pertinent documents.)

| Offender's Signature | ID# | Date |
|---|---|---|

ILLINOIS DEPARTMENT OF CORRECTIONS
**RESPONSE TO OFFENDER'S GRIEVANCE** (Continued)

Page 2 (con't)

Orlando Harvey, B28569                                    Grievance #1597-06-20

Relief requested:  To have the footage from the camera in one house core preserved from June 23 at 8:15-8:45pm at night med line, to have his right leg/knee MRI, to have proper medical treatment, to be compensated for his pain and suffering, to have ladders put up on all bunks in IDOC.

Per HCUA:  He was seen on 6/23/20 after reporting he slipped and fell .  The nurse noted minimal swelling and the knee was well aligned. He was given ice.  On 6/25/20 he was issued a knee sleeve.  He was recently seen by the MD again on 6/30/20 . Dr. Myers informed him he would present a request for an MRI and if Wexford approves he will be scheduled. He is receiving ice, knee sleeve and pain medication.

Ladders are a security issue medical does not provide those.

Monetary compensation is not awarded on this level.

Per Internal Affairs, video footage has been retained.

J.B. Pritzker
Governor



Rob Jeffreys
Acting Director

### The Illinois Department of Corrections

1301 Concordia Court. P.O. Box 19277 • Springfield. IL 62794-9277 • (217) 558-2200 TDD: (800) 526-0844

Offender:  Harvey, Orlando                                                     2/8/21
                                                                               Date
ID#:    B28569

Facility:   Pinckneyville Correctional Center

This is in response to your grievance received on  8/27/20 . This office has determined the issue will be addressed without a formal hearing. A review of the Grievance, Grievance Officer/CAO response to the grievance has been conducted. For a grievance that is direct review by the ARB, a review of the Grievance has been conducted.

**Your issue regarding: Grievance dated:** 6/24/20    **Grievance Number:** 1597-06-20    **Griev Loc:** Pinckneyville

- ☐ Transfer denied by the Facility
- ☐ Dietary _____
- ☐ Personal Property _____
- ☐ Mailroom/Publications _____
- ☐ Assignment (job, cell) _____
- ☐ Commissary / Trust Fund _____
- ☐ Conditions (cell conditions, cleaning supplies, etc.) _____
- ☐ Disciplinary Report: Dated: _____ Incident # _____
- ☑ Other   Medical - wants MRI for leg/knee

**Based on a review of all available information, this office has determined your grievance to be:**

- ☐ Affirmed, Warden _____ is advised to provide a written response of corrective action to this office by _____.
- ☐ Denied, in accordance with DR504F, this is an administrative decision.
- ☐ Denied, this office finds the issue was appropriately addressed by the facility Administration.
- ☐ Denied as the facility is following the procedures outlined in DR525.
- ☐ Denied as procedures were followed in accordance with DR 420 for removal/denial of an offender from/for an assignment.
- ☐ Denied as this office finds no violation of the offender's due process in accordance with DR504.80 and DR504.30. This office is reasonably satisfied the offender committed the offense cited in the report.
- ☑ Other:  Moot. Per HCU, offender had ACL repair two weeks ago and is scheduled for a follow-up with Ortho this week.

Financial compensation is beyond ARB jurisdiction. Bunk ladder is an administrative decision.

FOR THE BOARD:  _____         CONCURRED:  _____
                     Ann Lahr                                          Rob Jeffreys
              Administrative Review Board                             Acting Director

CC:  Warden,  Pinckneyville Correctional Center  Correctional Center
     Harvey, Orlando _____ , ID# B28569

---

*Mission: To serve justice in Illinois and increase public safety by promoting positive change in offender behavior, operating successful reentry programs, and reducing victimization.*

**www.illinois.gov/idoc**



# EXHIBIT

# R

**EXHIBIT III**

## STAFF POSITION REQUIREMENTS and JOB DESCRIPTIONS

<u>STAFF POSITION REQUIREMENTS</u>

This exhibit specifies the minimum qualifications which must be met by persons filling individual positions required by the Centers whether employee of Vendor or a person providing services as a subcontractor of the Vendor.

### <u>ON-SITE MEDICAL DIRECTOR</u>
MINIMUM REQUIREMNENTS
1. Licensed by the State of Illinois to practice medicine in all its branches
2. Current DEA number
3. CPR Certification

PREFERRED EXPERIENCE
1. Correctional Health Care
2. Completion of an accredited primary care residency training program
3. Board Certified or Eligible
4. Family Practice or Internal Medicine
5. Emergency Medicine
6. ACLS Certification
7. Management experience

### <u>DIRECTOR OF NURSING</u>
MINIMUM REQUIREMENTS
1. Illinois licensed (RN)
2. Two years nursing experience
3. CPR certification

PREFERRED EXPERIENCE:
1. Two years administrative experience
2. Correctional nursing

### <u>OFFICE COORDINATOR</u>
Minimum requirement
1. High School graduate
2. Two years of secretarial experience
3. Ability to multi-task
4. Proficient in the use of office equipment: computers, copy machines, telephones and dictation
5. Types 60 words per minute

### <u>PHYSICIAN</u>
MINIMUM REQUIREMENTS
1. Licensed by the State of Illinois to practice medicine in all its branches
2. CPR certification
3. Current DEA number

PREFERRED EXPERIENCE
1. Correctional Health Care
2. Family Practice or Internal Medicine
3. Emergency Medicine

### <u>REGISTERED NURSE</u>
MINIMUM REQUIREMENTS
1. Illinois licensed (RN)
2. CPR certification

PREFERRED EXPERIENCE
1. Correctional nursing

### <u>PHYSICIAN SPECIALISTS</u>
MINIMUM REQUIREMENTS
1. Licensed by the State of Illinois to practice medicine in all its branches

Exhibit III - 1

E-FILED
Monday, 10 December, 2018 03:37:11 PM
Clerk, U.S. District Court, ILCD



# EXHIBIT

# S

surgery. Rather, all physicians were and have been allowed to use their independent medical judgment in assessing and making recommendations for inmate medical care. There was no policy or procedure on behalf of Wexford Health Source, Inc, that prevented such a judgment on Dr. Scott's part.

65.    I see no evidence that any provider has ever conspired with Wexford Health Sources, Inc. or anyone else to deny Mr. ████ outside specialist consultation, diagnostic ultrasound testing or removal of his cyst.

66.    Mr. ████ allegations that Wexford has denied him needed specialty care based upon cost cutting measures makes no sense. Specialty outside care of consultations and surgery fees are paid directly by Medicaid Illinois HFS to the provider.

### DECLARATION

Pursuant to 28 U.S.C. §1746, I, Roderick Matticks, M.D. hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___7/13/18___.

_____
Roderick Matticks, M.D.

18

Bates 2-011

# EXHIBIT

# W

EXHIBIT IV

## PERFORMANCE TARGETS

In accordance to Section 3.9, the Performance Criteria listed in the table below will be monitored. In the event the performance falls below the Target, performance adjustments may be made. For a performance adjustment made according to the Applicable Schedule E category, the following calculation will be used: program adjustment amount (on Schedule E) times total population, times number of days in penalty period.

| Performance Criteria | Target |
|---|---|
| **Administrative** | |
| Pay all subcontractor bills/invoices timely and in compliance with Section 3.1.1.2.6. | 100% of acceptable bills/invoices should be paid within 60 days of receipt from subcontractor or in accordance with the written payment schedule agreed to with the subcontractor. |
| A final court judgment finding of an act of deliberate indifference or an act of discrimination against an IDOC offender. | 0 occurrences |
| Misrepresentation or falsification of information furnished to the Agency. | 0 occurrences |
| **Staffing and Schedules** | |
| Vendor's vacant staffing positions not filled in accordance with Exhibit II, Staffing Schedules will be considered a deviation from the Schedule E. | 100% compliance with Staffing Schedules |
| Vendor's filled staffing positions not covered in accordance with Exhibit II, Staffing Schedules or applicable ASRs will be considered a deviation from the Schedule E. | 100% compliance with Staffing Schedules |
| Vendor must provide On-Site Specialty Clinics in compliance with the staffing outlined in the Schedules E in Exhibit I. | 100% compliance with Schedule E |
| **Reporting** | |
| Annual Reconciliation of Hospital Utilization. Vendor shall keep off-site hospitalization to a minimum as measured by the Annual Hospital Utilization Threshold. (Section 3.1.2) | Hospital utilization should not exceed the Annual Hospital Utilization Threshold. |
| Monthly and Quarterly Reports. Vendor shall submit all reports at the specified timeframes in accordance with Section 2.9.3.2. | Monthly reports shall be submitted no later than the 20th day of the month following the report month. Quarterly reports shall be due no later than the 30th day after the end of each calendar quarter. |
| **Comprehensive Medical Programs** | |
| University of Illinois Medical Center at Chicago (UIMCC). Vendor must limit the referrals from the 5 specified Correctional Centers to UIMCC. | Referrals to UIMCC are limited to the 5 Correctional Centers pre-determined by the Department. Utilization not to exceed 216 in-patient admissions and 2,160 outpatient visits per contractual year, unless prior approval is received from IDOC Medical Director. |
| Administrative Directives (ADs). Vendor shall comply with the IDOC ADs when providing services under this contract. | 100% compliance with the ADs |

Exhibit IV - 1



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
prisoner.esl@ilsd.uscourts.gov

ELECTRONIC FILING COVER SHEET

Please complete this form and include it when submitting any type of document, letter, pleading, etc. to the U.S. District Court for the Southern District of Illinois for review and filing.

_Harvey, Q._
Name

_B285699_
ID Number

Please answer questions as thoroughly as possible and circle yes or no where indicated.

1. Is this a new civil rights complaint or habeas corpus petition?　　(Yes) or No

   If this is a habeas case, please circle the related statute:　28 U.S.C. 2241 or 28 U.S.C. 2254

2. Is this an Amended Complaint or an Amended Habeas Petition?　Yes or No

   If yes, please list case number: _____

   If yes, but you do not know the case number mark here: _____

3. Should this document be filed in a pending case?　Yes or No

   If yes, please list case number: _____

   If yes, but you do not know the case number mark here: _____

4. Please list the total number of pages being transmitted:　_61_

5. If multiple documents, please identify each document and the number of pages for each document. For example: Motion to Proceed In Forma Pauperis, 6 pages; Complaint, 28 pages.

   | Name of Document | Number of Pages |
   |---|---|
   | 1983 Complaint w/ Exhibits | 44 |
   | Motion for Appt. of Counsel | 11 |
   | Motion to Proceed Without Prepaying fees | 6 |
   | | |

Please note that discovery requests and responses are NOT to be filed, and should be forwarded to the attorney(s) of record. Discovery materials sent to the Court will be returned unfiled.