IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ORLANDO HARVEY #B28569, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 21-CV-803-SMY |
| | ) |
| PERCY MYERS, and WEXFORD | ) |
| HEALTH SOURCES, INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Orlando Harvey, an inmate formerly in the custody of the Illinois Department of Corrections ("IDOC") and now on parole[1], filed the instant lawsuit pursuant to 42 U.S.C. § 1983. He claims the defendants were deliberately indifferent to his serious medical needs following a knee injury at Pinckneyville Correctional Center, in violation of the Eighth Amendment (Doc. 9).

The case is now before the Court for consideration of the motion for summary judgment filed by Defendants Dr. Percy Myers and Wexford Health Sources, Inc. (Doc. 51). Plaintiff filed a response in opposition to the motion (Doc. 57). For the following reasons, the motion is **GRANTED in part**.

### Factual Background

The following relevant facts are undisputed unless otherwise noted: on June 9, 2020, while incarcerated at Pinckneyville Correctional Center, Plaintiff slipped off of a sink in his cell and injured his knee (Doc. 58-3 at 15:7-17). On the same day, Plaintiff was seen in the healthcare unit ("HCU") and provided low bunk and low gallery permits, crutches, an Ace wrap for 7 days, and

---

[1] The IDOC inmate search indicates that Plaintiff was paroled on June 24, 2022.

ice for 2 days (Doc. 52-1, pp. 1, 54-55).

Plaintiff returned to the HCU on June 10, 2020. He requested treatment and stated, "My knee has popped out and keeps popping out…I need an X-ray and something for the pain…I need help bad" (Doc. 58-2 at 64:2-9). The medical records for that day note, "Doctor did not order X-ray and will decide next step" (*Id.* at 64:21-23). On June 11, 2020, Plaintiff returned to the HCU the next day and again reported a popping in his right knee (Doc. 58-2 at 71:2-4).

On June 12, 2020, Plaintiff saw Doctor Myers for the first time following the knee injury (Doc. 58-3 at 18:6-8). He told Doctor Myers that he was experiencing pain in his knee and that his knee had "snapped" (*Id.* at 18:13-16). Doctor Myers ordered an X-ray (*Id.* at 19:5-7). Plaintiff underwent an X-ray of his right knee on June 19, 2020 that showed "no acute fracture or dislocation" (Doc. 58-4, p. 27).

Plaintiff's swelling continued, and on June 23, 2020, Doctor Myers sent him to Pinckneyville Community Hospital because of the possibility of Deep Vein Thrombosis in his lower right leg (Doc. 52-1, p. 3). At the hospital, Doctor George Grant noted a "high clinical concern for internal derangement" of Plaintiff's right knee and diagnostic considerations of a "meniscus injury" including an issue with the ACL (Doc. 58-4, pp. 18-22).

Upon Plaintiff's return from the hospital, Doctor Myers noted that the "knee remains swollen and tender to palpitation" (Doc. 52-1, p. 4). The same day, Plaintiff slipped in the "core of the cell house" while on crutches and further injured his knee (Doc. 58-3 at 22:12-20). On June 24, 2020, Plaintiff submitted a grievance in which he noted, "I told Doctor Myers that my knee keeps popping out and I need something to support my knee. But he did 'NOTHING' to keep from further injury to my knee . . . . . Right Now I'm in excruciating pain . . . I need an MRI to determine what's wrong with my (knee/right leg)" (Doc. 58-4, p. 29).

On June 30, 2020, Doctor Myers saw Plaintiff again and noted, "The knee is getting bigger," with "pain and instability of knee" (Doc. 52-1, p. 5). He submitted a request for an MRI to the Collegial Review Board that stated, "[Plaintiff] injured his knee 6/9 and then on 6/23 slipped on the wet floor and the swelling is worse and the pain is more severe" (Doc. 58-4, p. 25). The request did not include Plaintiff's reports of popping in his knee, the negative X-ray results, Plaintiff's clinical history including the hospital visit and Doctor Grant's third-party opinion, or his own notes indicating continuous swelling and instability. Based on the information provided by Dr. Myers, the Collegial Review Board responded on July 6, 2020 that Plaintiff should undergo an alternative treatment plan consisting of a physical therapy evaluation and therapy exercises, with instructions to resubmit a request for an MRI if needed after physical therapy had concluded (Doc. 52-1, p. 27). There is no indication in the record that Doctor Myers appealed this decision.

On July 15, 2020, Plaintiff first saw a physical therapist, Daniel Varel, who indicated that Plaintiff's signs, symptoms, and mechanism of injury were "consistent with an acute ACL tear" (Doc. 58-5 at 11:16-19). Varel provided Plaintiff with physical therapy but noted that he had persistent impairments with pain at the end ranges of motion. On July 16, 2020, Doctor Myers reviewed Plaintiff's chart, including the July 15, 2020 PT evaluation, and noted his plan for the "full 6 weeks of PT" and then review and "determine if MRI is needed" (Doc. 52-1, p. 6).

On August 17, 2020, Plaintiff reported that his pain was 6-9 out of 10, and stated, "I know there is something off-line in there that is rubbing up against that nerve." Doctor Myers' notes from that day indicate a decrease in knee mobility and an increase in swelling (Doc. 52-1, p. 10).

On September 2, 2020, Doctor Myers once again sought an MRI for Plaintiff, writing that there is "instability – right knee – PT advised MRI. Persistent instability with loss of motion and impaired gait" (Doc. 52-1, p. 32). On September 16, 2020, officials approved Plaintiff for an MRI

(Doc. 52-1, p. 33).

On October 7, 2020, Plaintiff underwent an MRI and was diagnosed with a "high-grade partial/near full-thickness tearing of the ACL," along with, *inter alia*, a "complex tear of the posterior horn and body medial meniscus," a "complex tear body and posterior horn lateral meniscus," and a "subchondral fracture over the posterior weightbearing rim of the lateral tibial plateau" (Doc. 58-1, p. 3). Physical therapy was discontinued on October 12, 2020 (Doc. 58-5 at 12:19 to 14:17).

Following the MRI, Plaintiff was approved for an outpatient orthopedic evaluation on October 23, 2020 (Doc. 52-1, p. 40). A doctor at the Orthopedic Institute of Southern Illinois recommended surgical intervention (Doc. 52-1, p. 45). Plaintiff underwent ACL reconstruction surgery on January 25, 2021 (Doc. 58-4, p. 3).

## Discussion

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue as to any material fact — that is where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). If the evidence is merely colorable or is not sufficiently probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

### Defendant Percy Myers, M.D.

Plaintiff claims Dr. Myers was deliberately indifferent to his serious knee condition in that he denied and/or delayed proper medical care, disregarded a hospital physician's recommendation

for Plaintiff to have an MRI, and required Plaintiff to undergo physical therapy before an MRI was conducted. The Eighth Amendment prohibits deliberate indifference to the serious medical needs of prisoners. *Machicote v. Roethlisberger,* 969 F.3d 822, 827 (7th Cir. 2020) (citing *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). A plaintiff asserting such a claim must offer evidence that he suffered from an objectively serious medical condition, and that the defendant actually knew of and disregarded a substantial risk of harm. *Murphy v. Wexford Health Sources Inc.,* 962 F.3d 911, 915 (7th Cir. 2020). Here, while Doctor Myers does not dispute that Plaintiff's knee injury was serious, he argues that he did not disregard a substantial risk of harm and that Plaintiff merely questions his professional judgment.

A medical professional displays deliberate indifference only if her decisions/actions represent a substantial departure from accepted professional judgment, practice, or standards. *Donald v. Wexford Health Sources, Inc.,* 982 F.3d 451, 458 (7th Cir. 2020). However, this standard is exacting: "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood,* 512 F.3d 886, 894-95 (7th Cir. 2008). Courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually did not base their decision on such a judgment. *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011).

In support of their motion, Defendants cite caselaw holding that "an MRI is simply a diagnostic tool," and the decision to forego diagnostic tests is "a classic example of a matter for medical judgment." *Pyles v. Fahim,* 771 F.3d 403, 411 (7th Cir. 2014) (citing *Estelle v. Gamble,* 429 U.S. 97, 107 (1976)). But in this instance, Doctor Myers did not decide to forego an

MRI based on medical judgment. In fact, he recognized that it was needed to further Plaintiff's treatment and submitted an initial request to Collegial Review on June 30, 2020. But he failed to include important information with the request, including Plaintiff's relevant clinical history and Doctor Grant's opinion regarding a possible ACL tear, and did not resubmit it until September 2, 2020.

Adequate communication regarding patients' ailments is essential to ensuring a patient receives appropriate treatment. Thus, a jury could reasonably conclude that Doctor Myers' lack of adequate communication (or immediate appeal of the Collegial Review Board's decision) was a substantial departure from professional standards and resulted in an unnecessary delay in Plaintiff obtaining the MRI and an exacerbation of his pain and suffering. *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010) (delays that exacerbate pain and suffering are cognizable under the Eighth Amendment); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007) (delays that may have resulted in additional and needless exacerbation of pain and suffering are actionable under the Eighth Amendment).

Summary Judgment will be denied with respect to Plaintiff's claim against Dr. Myers.

**Wexford Health Sources, Inc.**

Plaintiff alleges that Wexford has a policy of denying medical care for purpose of increasing profits. *Shields v. Ill. Dep't of Corrs.,* 746 F.3d 782, 789 (7th Cir. 2014) (Wexford may be held liable if a constitutional violation occurred as a result of a policy, custom, or practice of deliberate indifference). While Plaintiff asserts that Doctor Myers may not be paid the prevailing wage for a doctor, he concedes that he "cannot identify a Wexford policy or practice of denying medical care to increase profits" (Doc. 57, p. 10). Similarly, while Plaintiff alleges that Wexford hired underqualified and unqualified doctors such as Doctor Myers, he proffers no evidence to

support this allegation or to satisfy the *Monell* standard for liability. Accordingly, Wexford is entitled to summary judgment in this case.[2]

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 51) is **GRANTED** as to Plaintiff's claim against Wexford Health Sources, Inc., and **DENIED** as to Plaintiff's claim against Dr. Percy Myers. This case will be set for a status conference to select a firm trial date.

**IT IS SO ORDERED.**

**DATED:  June 7, 2023**

**STACI M. YANDLE**
**United States District Judge**

---

[2] Wexford cannot be held liable for an Eighth Amendment violation by its employee, Doctor Myers, simply based on the employment relationship. *Shields v. Ill. Dep't of Corrs.,* 746 F.3d 782, 789 (7th Cir. 2014).